UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
ALLEN J. PARRY,

                Plaintiff,

- against -

BLOOMBERG L.P.; AND GLENN JACOBY,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY
AS AN EMPLOYEE OF BLOOMBERG L.P.,

                Defendants.
---------------------------------------------------------X

Case No.: 05 CV 10213 (DLC)

**FIRST AMENDED COMPLAINT**
(Jury Trial Demanded)

*RECEIVED FEB 1 0 2006 U.S.D.C. S.D.N.Y. CASHIERS*

    COMES NOW Plaintiff, Allen J. Parry ("**Parry**"), by and through his undersigned counsel, The Law Offices of Neal Brickman P.C., located at 317 Madison Avenue, 21st Floor, New York, New York, 10017, and as and for his complaint against defendants, Bloomberg L.P. ("**Bloomberg**") and Glenn Jacoby ("**Jacoby**"), states and alleges as follows:

### NATURE OF THE ACTION

    1.    This is an action alleging age discrimination and retaliatory conduct under New York Executive Law § 296 and New York Administrative Law § 8-107. Parry alleges that, as a direct result of his age, he became the target of management's directives to rid defendant Bloomberg's research and development department of its "old guard" employees who had been trained under the company's former procedures and with different technology. Specifically, Parry claims that, as a direct result of his age, he suffered adverse employment decisions resulting in his demotion from the position of "project manager" and cancellation of a promised 20% performance bonus. In addition, Parry suffered reduced compensation in relation to younger, similarly-situated employees in that he never was issued the standard ration of "equity

1

equivalency certificates" or awarded the minimum standard salary increases Bloomberg awarded to younger employees; all despite Parry's excellent performance reviews at the time. Finally, Parry experienced assignment of an unrealistic workload amounting to 2-3 times that of similarly-situated employees, contrived negative performance reviews and further demotion after refusing to engage in discrimination against other workers. Parry maintains that defendants would not have engaged in these adverse actions but for his age. Moreover, Parry alleges that following the initial filing of the complaint in this action on December 6, 2005, he suffered adverse employment actions in retaliation, including, but not limited to, exclusion from work assignment meetings, depravation of necessary access that is required for Parry to complete his work assignments, further contrived allegations of deficient performance and reassignment of the essential duties which are necessary for him to receive certain compensation benefits and promotion to others. Parry seeks compensatory and punitive damages, costs, relevant interest, and attorneys' fees for these violations.

## JURISDICTION AND VENUE

2.  This Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states for purposes of diversity jurisdiction under 28 U.S.C. § 1332(c), and because the amount in controversy, exclusive of fees and costs, exceeds the sum of $75,000.00.

3.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Parry's State law claims arising under New York Executive Law § 296 and under the New York City Administrative Code §§ 8-107 and 8-502.

4.  Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391

because the defendant entity resides, for purposes of venue pursuant to 28 U.S.C. § 1391(c), in this judicial district and because a substantial part of the of the events giving rise to the claims herein occurred in this judicial district.

## PARTIES

5. Plaintiff Allen J. Parry ("**Parry**") is an individual citizen of the United States residing at 15 Prospect Street, Greenwich, Connecticut, 06830. Parry is forty-eight (48) years old and an employee of Defendant Bloomberg L.P.

6. Upon information and belief, at all times relevant hereto, Defendant Bloomberg was and is a Delaware Limited Partnership, duly authorized to conduct business in the State of New York and subject to the laws and statutes thereof.

7. As set forth further below, Bloomberg is a multi-media conglomerate which maintains its principal place of business in New York City. It specializes in the broadcast and dissemination of financial news and information via radio, television and satellite broadcasts, as well as electronic terminals, which transmit data throughout the New York City metropolitan area, thus directly availing itself of the laws of the State of New York and doing substantial business therein.

8. Upon information and belief, at all times relevant hereto, defendant Jacoby served as Parry's "R & D Manager" or "Trading Systems Manager" who reported directly to Bloomberg's Chief Information Officer, Kenneth Gaertner and others in Bloomberg's senior management. In that capacity, Jacoby qualifies as an "employer" under New York Executive Law § 296 and New York Administrative Law § 8-107 because he could control the terms and conditions of Parry's employment, including the ability to hire and fire him. Upon information

and belief, Jacoby is a resident of the State of New Jersey for purposes of diversity jurisdiction.

## FACTUAL BACKGROUND

9. On or about July 1, 2000, Mr. Parry, then 42 years of age, began working for Bloomberg L.P. as a "project manager" for Bloomberg's Graphics and Technical Analysis group. In that capacity, he was responsible for technical analysis, as well as fixing "bugs" in the various languages and codes used in the programming of Bloomberg's products, built largely upon "home-grown" proprietary technology. Parry initially led a team of three (3) programmers, which was later expanded to approximately six (6) staff members. The team also developed new applications and programs to be compatible with Bloomberg's proprietary software.

10. Parry came to Bloomberg with a wealth of expertise, having had more than thirty (30) years of experience in the engineering, development and maintenance of business application software and more than twenty (20) years in project management.

11. Upon information and belief, Bloomberg was particularly interested in Parry because of his knowledge of a computer language known as FORTRAN, an exceedingly obscure language designed to fulfill the needs of 1970's era computer hardware and numerical models and not in general industry usage in late 2000. Fortran was a requirement for the position, and Parry was tested in the FORTRAN language as part of the interview process.

12. Upon information and belief, the FORTRAN language, known in the industry as a "legacy language," was used to power many of Bloomberg's products in addition to much of its proprietary software and systems at that time. Bloomberg was unique in that it had constructed its own database "from scratch" which formed the basis of "The Bloomberg," an ubiquitous and all-encompassing company network onto which each employee was trained to

enter and log any and all work product (e.g. program design and accompanying analysis, testing and progress reports), his or her work schedule (including working hours, vacation days, late days and biographical information), as well as correspondence with other employees and management.[1]

13. The wide-spread and continued use of FORTRAN and other legacy systems such as the nearly obsolete "C" language, effectively served as an employee-retention device at a time when technical personnel were in great demand. Although masquerading as a stalwart sentinel of Bloomberg's culture of "uniqueness" and unwavering devotion to "the Bloomberg way," maintenance of these systems effectively created an "old guard" of technical employees who, steeped in Bloomberg's use of obscure technology, peculiar procedures, and dependence upon "The Bloomberg," simply were less marketable, and hence less mobile, outside of the Bloomberg organization.[2]

14. Upon information and belief, this strategy was enormously beneficial to Bloomberg during the internet bubble of the late 1990s and was calculated specifically to combat the widespread flight by technical personnel which already had begun began to plague Bloomberg and its competitors in the early 1990s.

15. Parry was brought in specifically to track the progress of various technical initiatives and to fix the numerous "bugs" in the Bloomberg products due, in no small measure,

---

[1] Whereas most companies purchase standard databases such as "Oracle," Bloomberg's operations are almost entirely based upon a primitive, FORTRAN-based home-grown database called COMDB.

[2] Specifically, at all times relevant, the industry at large demanded that job-seekers demonstrate proficiency in the C++ and Java languages, as well as with the Oracle and TCP/IP databases. Bloomberg's peculiar use of FORTRAN, C, and COMDB had little or no value outside of the company, as was intended to ensure less technology personnel flight to web-based start ups, or other technology sector firms or even more traditional companies with in-house technology positions.

to Bloomberg's insistence on the continued use of out-dated, out-moded and largely inefficient technology.

16. During Parry's first four (4) years as a Bloomberg employee, he was responsible for managing a variety of technical employees and assumed positions of progressively increased responsibility which involved greater supervisory and management duties.

17. Despite Parry's impressive experience and proven track record, Bloomberg issued Parry scant "equity equivalency certificates," upon information and belief, a regular feature of Bloomberg's compensation scheme for younger employees in similar positions of responsibility. Parry was issued a total of 15 EECs at his hiring, but received no further certificates for a period of three (3) years, far below the level of similarly-situated younger employees with comparably favorable performance reviews. For the entire five (5) year period, Parry received only one additional disbursement of twenty (20) EECs, before being cancelled altogether.

18. Additionally, Parry was and remains one of a minority of Bloomberg employees never to receive a salary increase in the first four (4) years of his employment, upon information and belief, a regular feature of Bloomberg's compensation scheme for younger employees in positions of comparable responsibility. This despite his excellent performance reviews and promotions during that period. Upon information and belief, the standard base salary increase for the year 2005 is 3.5%, although it was as high as 5% in previous years.

19. In or around April 2004, Parry was promoted to the position of Head of Trading Systems Project Management Office ("**TS PMO**"). In that capacity, Parry was in charge

of a team of software developers and had additional managerial responsibility and authority.

20.  In late April or early May of 2004, defendant Jacoby extended an invitation to Parry to join the weekly "manager's meeting," a closed meeting of managerial staff in which company initiatives and directives were and are communicated; special projects are assigned and delegated; and performance and personnel issues discussed.

21.  On or about May 14, 2004, Parry attended the first of several of the manager's meetings. In the first meeting, Jacoby unveiled an aggressive campaign to upgrade Bloomberg's R&D through a process of "re-rating" and "re-evaluating" employees so as to replace the "old guard" with "new hires." Jacoby explained that Bloomberg R&D needed to replace its older system because Bloomberg's products were no longer "scalable"[3] due to outdated technologies. Similarly, Jacoby asserted that the so-called "old guard" needed to be replaced with recent college graduates.

22.  Jacoby never raised or discussed the issue of training any existing employees in the applications/languages common to the marketplace (the very technologies Bloomberg had striven to keep its employees from learning as they developed.) Instead Jacoby provided an incentive for turnover, promising that for every person a manager could "get rid of," that manager would be rewarded with a "PDSK."

23.  Upon information and belief, the term "PDSK"[4] is a term used within Bloomberg to refer to senior management's authorization to hire a new employee. Jacoby

---

[3] Upon information and belief, also a Bloomberg term of art which refers to a product's growth potential and believed to derive from the economic concept of "economy of scale."

[4] Pronounced as "P-Desk."

7

boasted that the authorization came "straight from Tom Secunda," upon information and belief, a co-founder and partner of Bloomberg.

24. According to Jacoby, all employees were to be re-evaluated and re-rated on a scale of one (1) to six (6) under the new system, with one (1) being best. Management then would target any and all "fives" and "sixes" for replacement with new hires.

25. Jacoby ended the May 14th meeting by identifying the first target of his pogrom, one Paul Joselow, then fifty (50) years of age. Jacoby explained that the way to "get rid" of Joselow was for each and every manager to "heap work on him." Jacoby specifically directed Parry to "heap work" onto Paul Joselow.

26. In or around June of 2004, Jonathan Wang, Parry's direct supervisor at the time, pulled Parry aside, and showed him Parry's "new" rating. Parry noted that it was a 1.5, nearly perfect on the scale as explained by Jacoby at the May 14th meeting.

27. In or around July of 2004, management approved a $3,000 raise in Parry's salary, his first raise in approximately four (4) years at the company, despite excellent performance reviews and promotions during the preceding years. The increase represented 2.5% of his annual pay, far below the increases that Bloomberg generally awarded at that time to similarly-situated younger employees in similarly responsible positions for equivalent years of service.

28. During the next two (2) months, July and August of 2004, Parry continued to attend Jacoby's "manager's meetings," but refused to follow Jacoby's directives to set up Paul Joselow. Parry became alarmed when Jacoby began to fire several of the older managers and replace them with recent college graduates. In July and August of 2004, Parry began to raise

concerns that the quality of some projects might suffer under management's sweeping personnel initiatives.

29.     Immediately thereafter, on or about August 20, 2004, Wang sent Parry an e-mail informing him not to attend any further manager's meetings. The ostensible reason was that there simply were too many people for the room, although Wang later told Parry that Jacoby was complaining about Parry's "breath."

30.     Fearing further reprisals, Parry continued in his position as head of TS PMO and redoubled his efforts. Due to excellent performance, and accompanying demand for his analysis, Parry was invited back to the manager's meetings on a sporadic basis in or around mid October, 2004.[5] Demand for Parry's reports and analysis continued to grow in November and December, and, because of increased workload, management assigned three (3) new developers to Parry's team.

31.     On or about December 5, 2004, Wang informed Parry, by encrypted e-mail transmission, that Parry had been "budgeted" for a 20% pay increase following Parry's "anniversary" in July, 2005.

32.     By early January 2005, however, Jacoby's rhetoric became increasingly vitriolic. Jacoby complained that the managers had not done their part in "getting rid of people," that the ratings were "skewed," and ordered that the managers begin "aggressively" pursuing those employees with a "4" rating, in addition to those with a "5" or "6."

33.     During this period, Jacoby told Wang and another manager, Sheri Finkelstein, that Parry was not a "team player," and that management should "get rid of him."

---

[5]Apparently, Jacoby perceived the room as somehow larger in October of 2004.

34. From January 20, 2005 through the end of February, 2005, Parry's workload increased suddenly and substantially, and he was required to work late hours in addition to weekends in order to keep up with the amount of work assigned him. Upon information and belief, Parry's workload exceeded 2-3 times that of other employees in the department. Parry requested additional support numerous times and was told that Paul Joselow, continuing victim of Jacoby's revolution, would be assigned additional projects, but this never occurred.

35. In mid-February 2005, Jacoby and Wang assigned Parry two (2) projects of critical priority for two (2) unrelated departments. Parry wrote to Wang, who had left on vacation for California and had assigned Parry this additional work via e-mail. Parry warned that both projects could not be completed without either or both priorities "getting into trouble." Wang's singular response was to "fix it."

36. On or about February 24, 2005, one of the projects missed a target deadline, and Jacoby, seizing the opportunity that he had maliciously and meticulously orchestrated, stripped Parry of his team, his managerial duties, and his performance rating. Jacoby ordered Wang to lower Parry's performance rating from a "1.5" to a "6."

37. On or about March 4, 2005, Wang pulled Parry aside to inform him of the rating change. Wang advised Parry "as a friend" to seek other employment. Wang repeated this admonition weekly until Wang's departure from Bloomberg in or about May of 2005. Wang made clear that Jacoby was putting the pressure on Wang to force Parry out of the company.

38. On or about March 7, 2005, Jacoby and Joe Bruzzese, of Human Resources, asked Parry to sign a "performance issues" memorandum. Parry insisted that the

memorandum was factually inaccurate and refused to sign it unless certain changes were made. Both Jacoby and Bruzzese downplayed the nature and consequences of the memorandum. In fact, Parry was told that it was an "internal trading systems document" which would not be sent to Human Resources.

39. Upon information and belief, immediately after Parry signed the memorandum, it was rushed upstairs to Human Resources for further action.

40. During the months of April and May of 2005, Jacoby assigned Parry to various projects as a menial computer programmer. Mr. Parry was hired as a manager in 2000.

41. On or about May 20, 2005, Parry's new supervisor, Sheri Finkelstein acting under orders from Jacoby, wrote a review of Parry's performance. Although Finkelstein had only been Parry's direct supervisor for a matter of weeks (having replaced Wang), the evaluation purported to cover the entire period during which Parry was head of TS PMO. The evaluation falsely asserted that Parry's performance was deficient and "not consistent with his level of seniority." The evaluation further mischaracterizes Parry's position as one limited to "writing administrative reports" for "small scale projects."

42. Defendant Bloomberg informed Parry on or about July 1, 2005 that the previously-promised 20% increase in his salary would not be forthcoming.

43. On or about December 3, 2005, Plaintiff, through counsel, informed Defendant Bloomberg that Plaintiff intended to file a complaint in this action alleging age discrimination and retaliation, and requested instructions for service of process.

44. On December 6, 2005, according to the instructions given by Bloomberg counsel, Plaintiff filed and served his complaint, case number 05 CV 10213, alleging age

discrimination and retaliation under New York state and local law.

45.  On that same say, Parry was informed by his direct supervisor that his scheduled "weekly meeting," where work assignments are distributed and discussed, had been cancelled. Subsequent meetings on December 8, 2005, December 13, 2005, and December 20, 2005 also were cancelled.

46.  Additionally, in the three-week period immediately following the initial filing of this action, Parry was locked out of management meetings, stripped of access to a program or function known as "PN Diary Permission" that was required to complete the projects he was working on, and told by his immediate supervisor that no new work was to be assigned to him.

47.  Without access to "PN Diary Permission," Parry was not able to complete the assignments given to him without resorting to mining the data from freely accessible sources, a process which made completion of his duties impossible.[6]

48.  Defendants also reassigned Parry's essential duties to other employees, including employees who are not authorized under Bloomberg's policies to perform them. Specifically, Parry has not been given any "Parent TREQ" assignments (those emphasized in the performance evaluations), and given only "DRQS," for which employees are given no credit on the evaluations whatsoever.

49.  By contrast, Dan Hong, upon information and belief, an employee of

---

[6] The fact that the data was available through freely-accessible sources undermines any possible argument that security was somehow a factor in the decision to deprive Parry of the necessary access. All that was accomplished was that Parry experienced tremendous frustration and loss of time attempting to perform simple tasks for which he was subsequently chastised on grounds that he did not complete those tasks in a timely fashion.

defendant Bloomberg who was not authorized under existing procedures to perform the task, secretly was assigned one of Parry's high-priority projects known as "MDSH."

50. On or about December 22, 2005, Plaintiff submitted a memorandum to Bloomberg LP Human resources, detailing the retaliatory conduct. Following submission of that memorandum, Plaintiff's workload suffered an even more drastic decline in importance and volume.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
(Age Discrimination In Violation of New York Executive Law §296 and
New York City Administrative Code §8-107 As Against Both Defendants)

51. Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "50" with the same force and effect as if fully set forth herein at length.

52. Plaintiff was over the age of Forty (40) when his workload was suddenly and unjustifiably increased in relation to other employees, when he was stripped of his team, his managerial duties, his bonus, his excellent performance rating and subjected to contrived negative performance reviews.

53. Plaintiff's age was an impermissible factor in the decision to demote him by means of a scheme or "set up," perpetuated by management to create a justifiable reason for his demotion in rank and position.

54. Similarly situated younger employees (i.e. those with equivalent job duties and similar performance reviews) did not experience comparable treatment, demotion or reduction in pay.

55. Plaintiff was over 40 when his compensation effectively was reduced in relation to younger, similarly situated employees in that he did not receive the standard ration of "equity equivalency certificates" or base salary increases despite having worked for Bloomberg for approximately five (5) years.

56. There was no legitimate, nondiscriminatory reason for Plaintiff to be demoted, re-ranked, removed from his duties and stripped of his promised performance bonus.

57. There was no legitimate, nondiscriminatory reason for Plaintiff not to receive the standard 3.5% annual salary increases and equity equivalency certificates awarded to similarly-situated younger employees.

58. New York Executive Law §296 and New York Administrative Code § 8-107 prohibit discrimination on the basis of age.

59. As a direct result of these discriminatory acts in direct violation of New York Executive Law §296 and New York Administrative Code § 8-107, including, but not limited to, Parry's reduction in compensation, contrived negative performance reviews and unjustifiable demotion, Plaintiff suffered injury and harm including, but not limited to, loss of past and future income, damage to his business reputation and marketability, and emotional injuries.

60. Further, Defendant's conduct was wanton, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, Plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Three Hundred Fifty Thousand Dollars ($350,000.00) in compensatory damages; punitive damages in an amount to be

determined at trial, but in no event less than One Million Dollars ($1,000,000); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A SECOND CAUSE OF ACTION
(Retaliation In Violation of New York Executive Law §296 and
New York City Administrative Code §8-107 As Against Both Defendants)

61.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "60" with the same force and effect as if fully set forth herein at length.

62.     Plaintiff filed a complaint in this action on December 6, 2005, case number 05 CV 10213, alleging age discrimination and retaliation under New York state and local law.

63.     Within one (1) day of the filing, Defendants engaged in acts of retaliation, including, but not limited to, locking Plaintiff out of meetings, depriving him of work assignments, stripping him of a necessary access that is required for Parry to check the accuracy of his programming and reassignment of his duties to others. These acts were calculated to result in poor performance reviews and the continued false allegations of deficient performance as a direct result of Plaintiff's opposition to, and complaints concerning, the age discrimination that defendants perpetrated against him.

64.     Specifically, in the three (3) weeks immediately following the filing of this action, Parry was locked out of management meetings where work assignments are given, he was stripped of a security clearance that was necessary to complete his assignments with accuracy — so that he could not possibly perform his duties as required — and he was told by his

immediate supervisor that no new work was to be assigned to him.

65. Defendants' actions adversely affected the terms and conditions of Plaintiff's employment in that Bloomberg LP makes compensation decisions based on hours billable, the completion of priority projects and the accuracy of work performed. Defendants' actions have, and will continue to, negatively impact Plaintiff's ability to receive compensation and promotions.

66. As a result of these retaliatory acts, Plaintiff lodged an additional written complaint on December 22, 2005, which was met with an even sharper decline in his workload, calculated to retaliate against Parry for his opposition to the discriminatory conduct. Plaintiff has not been restored to his previous duties or anything resembling the position for which he was hired in 2000.

67. New York Executive Law § 296 and New York City Administrative Code § 8-107 prohibit acts of retaliation in response to an employee's filing or communication of a complaint or charge of improper discrimination as Plaintiff did herein.

68. As a direct result of defendants' violations of New York Executive Law §296 and New York Administrative Code § 8-107, Plaintiff has suffered damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, and emotional injuries.

69. Further, Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Three Hundred Fifty Thousand

Dollars ($350,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than One Million Dollars ($1,000,000); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

70.  Plaintiff hereby demands a jury trial of the facts and circumstances alleged herein.

Dated:  New York, New York
        February 10, 2006

*(signature)*

The Law Offices of Neal Brickman
Attorneys for Plaintiff Allen J. Parry
317 Madison Avenue - 21st Floor
New York, New York 10017
(212) 986-6840

UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
ALLEN J. PARRY,

      Plaintiff,    Case No. 05 CV 10213 (DLC)

- against -

              **AFFIDAVIT OF SERVICE**

BLOOMBERG L.P; AND GLENN JACOBY
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS AN EMPLOYEE OF
BLOOMBERG L.P,

      Defendants.
- - - - - - - - - - - - - - - - - x

STATE OF NEW YORK }
          ss.:
COUNTY OF NEW YORK }

    IDRIS MAHMOUD, being duly sworn, deposes and says that he is over the age of 18 years; is not a party to this action and resides within the State of New York. That on February 14, 2006, he serve the within FIRST AMENDED COMPLAINT upon the defendants attorney by placing a true copy of the same in a postpaid Federal Express wrapper bearing the tracking number 7920 1570 6559 , duly addressed as follows:

        Thomas H. Golden, Esq.
        Willkie Farr & Gallagher LLP
        787 Seventh Avenue
        New York, NY 10019

                  _/s/ Idris Mahmoud_
                  IDRIS MAHMOUD
                  LIC.# 1151131

Sworn to before me this
14th day of February, 2006

_/s/ Jacquelyn E. Ford_
NOTARY PUBLIC

JACQUELYN E. FORD
Notary Public, State of New York
No. 01FO4851616
Qualified in Orange County
Commission Expires February 3, 20 10